**Affirmed and Memorandum Opinion filed November 26, 2024.**



**In the**

**Fourteenth Court of Appeals**

_____

**NO. 14-22-00653-CV**

_____

**ANDRE MCCOY, Appellant**

**V.**

**ROBERT ANDING, M.D.; MARYAM BAIRD, M.D.; DAWN BLACK, M.D.; GINGER CATHEY, M.D.; SUBODH CHAUHAN, M.D.; NICHOLE COLE, M.D.; S. MARK CONE M.D.; JASON COOPER, M.D.; RANDALL C. DUNN, M.D; GEORGE GRUNERT, M.D.; JAMES R. GULLETT, M.D.; GEFFREY KLEIN, M.D.; JOY LEBLANC, M.D.; LEROY J. LEEDS, M.D.; SHELLY LEEDS-RITCHER, M.D.; RAKESH MANGAL, M.D.; CHANTAL NGUYEN-TRAN, M.D.; CARLOS RAMOS, M.D.; LEAH SCHENK M.D.; IVONNE SMITH, M.D.; AND MARY VAN SICKLE, M.D., Appellees**

**On Appeal from the Probate Court No. 2**
**Harris County, Texas**
**Trial Court Cause No. 352,923-405**

**M E M O R A N D U M   O P I N I O N**

Appellant Andre McCoy was unable to collect the full amount of a judgment in his favor holding a professional limited liability company vicariously liable for

the medical malpractice of one of its doctors. After the company ceased operations and its physicians moved on, McCoy sued the doctors who had been members of the company, seeking to hold them personally liable for the judgment under veil-piercing and fraudulent-transfer theories of liability. The physicians attacked those theories in five summary-judgment motions, and the trial court granted each of them. McCoy appeals the portion of the final judgment incorporating those rulings, and the physicians argue in a cross-point that the trial court erred in denying an additional summary-judgment motion.

We need review only two of the motions, each of which addresses one of McCoy's liability theories. Because no evidence supports McCoy's veil-piercing or fraudulent-transfer theories, we affirm the portion of the judgment granting the motions that the parties refer to as Motion No. 2 and Motion No. 5. Without addressing the remaining issues or the crosspoint, we affirm the trial court's judgment.

## I. BACKGROUND

In September 2004, Shannon McCoy suffered a placental abruption during her thirty-seventh week of pregnancy. Complications during and after the delivery of her stillborn infant caused Shannon brain damage, quadriplegia, and later, her death. In 2006, her husband Andre McCoy sued Shannon's obstetrician Dr. Debra Gunn and Dr. Gunn's employing medical group, Obstetrical and Gynecological Associates, P.A., later known as Obstetrical and Gynecological Associates, P.L.L.C. (OGA). The medical-malpractice case was tried to a jury, and the trial court rendered judgment on November 4, 2013. In "the Malpractice Judgment," the trial court held OGA jointly and severally liable with Gunn "under the doctrine of *respondeat superior* and the vicarious liability provisions of the Texas Professional Association Act."

2

Andre McCoy was unable to collect the full amount of the Malpractice Judgment from OGA and Gunn, and in January 2020, McCoy sued a number of physicians who currently or formerly held ownership interests in OGA, seeking to hold them liable for the Malpractice Judgment under a veil-piercing theory or the Texas Uniform Fraudulent Transfer Act (TUFTA).[1]

At issue in this appeal are five summary-judgment motions—one traditional motion and four no-evidence motions—filed by various combinations of defendants. After McCoy nonsuited some of the movants,[2] the trial court ultimately granted all five summary-judgment motions in favor of nineteen physicians. We refer to them collectively as "the Doctors."[3]

Some of the Doctors had counterclaimed for attorney's fees and costs. A few nonsuited their counterclaims, and the remaining claims for attorney's fees were tried to a jury, but the jury found that a reasonable fee for the necessary legal services of counsel for each counterclaimant was zero.[4]

In five issues, McCoy challenges the trial court's judgment granting Motion Nos. 1 through 5. In a cross-point, the Doctors argue that we can affirm on the

---

[1] TEX. BUS. & COM. CODE § 24.001 *et seq.*

[2] McCoy nonsuited his claims against Drs. Patrice Firpo, Leroy J. Leeds, Ana Morales, Tobey Stevens, and Mary Van Sickle. He also expressly abandoned a variation on his veil-piercing theory in which he argued that the defendants denuded OGA. We therefore do not consider the summary-judgment proceedings or appellate arguments as applied to those defendants or that issue.

[3] They are Drs. Robert Anding, Maryam Baird, Dawn Black, Ginger Cathey, Subodh Chauhan, Nichole Cole, Mark Cone, Jason Cooper, Randall C. Dunne, George Grunert, James R. Gullett, Geffrey Klein, Joy LeBlanc, Shelly Leeds-Richter, Rakesh Mangal, Chantal Nguyen-Tran, Carlos Ramos, Leah Schenk, and Ivonne Smith.

[4] The trial court granted Dr. Leeds and Dr. Van Sickle a new trial on the issue of attorney's fees but severed those claims from this case.

alternate ground that the trial court erred in denying their additional summary-judgment motion to bar McCoy's claims based on statutes of limitations or repose.

## II. STANDARD OF REVIEW

In a no-evidence motion for summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the nonmovant bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). We review the trial court's grant of summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)). We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

## III. ANALYSIS

When rulings on both a traditional and a no-evidence summary-judgment motion are presented for review, we generally begin with the no-evidence motion. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Moreover, our opinion must be "brief as practicable" while addressing every issue raised that is necessary to a final disposition of the appeal. TEX. R. APP. P. 47.1. We therefore begin with the two no-evidence summary-judgment motions that all of the Doctors

joined as movants: Motion No. 2, addressing McCoy's veil-piercing claims,[5] and Motion No. 5, addressing his TUFTA claims. Both theories concern the facts described below.

In 2006, Amegy Bank made a loan to OGA secured by all of OGA's property, including accounts receivable, "whether now owned or hereafter acquired." In 2011, OGA converted from a professional association to a professional limited liability company. At about the same time, OGA's indebtedness to Amegy was divided into separate promissory notes for which OGA's individual member-physicians personally guaranteed payment.

By late 2014, a majority of OGA's members felt that the problems associated with the outstanding Malpractice Judgment against it were so great that it would be best to simply shutter the company and start over. OGA's management and members agreed that OGA and its subsidiaries would cease doing business effective December 31, 2014. As a planned part of this cessation of business, Texas Citizens Bank purchased the loan from Amegy, and Amegy assigned the notes and the liens on OGA's property to Texas Citizens Bank. OGA terminated all employment agreements with its physicians, and beginning on January 1, 2015, a number of OGA physicians moved their practices to a newly formed entity, Southwest Women's Health Alliance, PLLC, or to a subsidiary of Southwest.

In describing the conduct or transactions on which his claims are based, McCoy refers generally to OGA's creation of a security interest in its property (2006), OGA's conversion from a professional association to a professional limited

---

[5] Although we use the term "veil-piercing claim" as a sort of verbal shorthand, it is not actually an independent cause of action. *See Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App.— Houston [14th Dist.] 2014, no pet.) (sub. op. on denial of reh'g). It is simply "a means of imposing liability on an underlying cause of action such as a tort or breach of contract." *Gallagher v. McClure Bintliff*, 740 S.W.2d 118, 119–20 (Tex. App.—Austin 1987, writ denied).

liability corporation (2011), the cessation of OGA's operations (2014), and the sale or assignment to Texas Citizens Bank of Amegy's loan and security interest in OGA's property (2014 and 2015).

## A.     Motion No. 2: Veil-Piercing

McCoy pleaded that "[t]his suit is necessary to collect on a legal debt and damages due and owing to Plaintiff as a direct and proximate result of . . . Defendants' individual and collective abuse of the corporate form to avoid a pending tort judgment."[6] McCoy alleged that OGA's corporate veil should be pierced "because Defendants improperly used the corporate form of these entities [sic] as a means of evading an existing legal obligation of [OGA] [i.e., the Malpractice Judgment]; and, holding only these entities responsible will result in injustice." In Motion No. 2, the Doctors stated that there is no evidence they abused OGA's corporate form. *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) (such abuse consists of "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like"). The Doctors are correct.

McCoy first argues that there is a fact issue on abuse of the corporate form inasmuch as the Doctors "purposefully created" Obstetrical and Gynecological Associates, P.L.L.C., "to avoid the consequences of an adverse judgment"; however, McCoy does not explain how the conversion of a professional association to a professional limited liability company could have such an effect. *See* TEX. BUS. ORGS. CODE § 10.106(3) (upon conversion, "all liabilities and obligations of the converting entity continue to be liabilities and obligations of the converted entity in the new organizational form without impairment or diminution because of the

---

[6] In referring to "the corporate form," McCoy includes professional associations and professional limited liability companies, as do we.

conversion"). OGA converted its organizational form while the medical-malpractice suit was pending, and the lawsuit could, and did, proceed to judgment. *Id.* § 10.106(5). Two years after OGA's conversion, the trial court acknowledged the conversion in rendering the Malpractice Judgment against "Obstetrical and Gynecological Associates, P.A. n/k/a Obstetrical and Gynecological Associates, P.L.L.C."

McCoy asserts that the Doctors converted OGA from a professional association to a professional limited liability company because, "as a result of the judgment, it had no ability to continue doing business." In other words, McCoy contends that, as a result of the Malpractice Judgment in 2013, OGA, P.A., "had no ability to continue doing business," so the Doctors converted the company to OGA, P.L.L.C., in 2011. He does not say why this would be an abuse of OGA's corporate form; as mentioned above, conversion has no effect on a company's liabilities. Moreover, McCoy's temporal arrangement of events is not possible, because the conversion predates the Malpractice Judgment.[7]

---

[7] The confusion arises from McCoy's mistaken assumption that OGA, P.A., and OGA, P.L.L.C., are different companies, when in fact, they are different organizational forms of the same company. *See* TEX. BUS. ORGS. CODE § 10.106(1) ("When a conversion takes effect . . . the converting entity continues to exist without interruption in the organizational form of the converted entity rather than in the organizational form of the converting entity . . . ."). Reading the testimony on which McCoy relies in context, and with the knowledge that OGA, P.A., and OGA, P.L.L.C., are the same company, clarifies that misunderstanding.

McCoy quotes an excerpt from deponent Dr. S. Mark Cone's response to the question, "OGA, P.L.L.C., what entity came after that that employed the physicians?" Dr. Cone began, "There—there is not an entity that—I mean, I can—I can walk him through some of the—" After being redirected to answer the question, Dr. Cone said, "There—there is no—so OGA, P.L.L.C. was a part of the corporate restructure from the P.A. The P.A. was formed in 1962. It's one of the oldest and most prestigious OB/GYN groups in—in the country. It—It—*as a result of the judgment, it had no ability to continue doing business.*" (emphasis added). McCoy quotes the italicized language, which he reads to mean that "it"—meaning the professional association could not continue doing business after the Malpractice Judgment. He then infers that this is why the Doctors converted the business to a professional limited liability company, which he treats as a separate company. But, in the cited testimony, Dr. Cone is discussing only one company: OGA.

7

McCoy next argues that the Doctors abused OGA's corporate form in that OGA "used its accounts receivable to collateralize its new note with Texas Citizens Bank." This argument suffers from the same problems: McCoy does not explain how this would constitute abuse by the Doctors of OGA's corporate form, and the statement is factually inaccurate. In the evidence McCoy cites in support of this statement, Dr. Cone was asked directly, "Did OGA, PLLC use its accounts receivable to collateralize the new note with Texas Citizens Bank?" He answered, "OGA's loan that was bought by Texas Citizens was still collateralized by OGA's accounts receivable." He further explained, "The Amegy loan was tied to OGA's accounts receivable. Texas Citizens bought the Amegy loan all tied to OGA."

McCoy also states, "Dr. Cone testified that the corporate restructuring of OGA—as a direct result of the [Malpractice] Judgment—ultimately resulted in assets being moved out of OGA, PLLC." But the evidence is precisely the opposite. Dr. Cone explained that the last step in the original design of OGA's restructure called for OGA's furniture, fixtures, and equipment to be moved from its wholly owned limited liability companies to "the property LLC's," but "Amegy wouldn't let us." Here is the conclusion of that testimony:

Q: But ultimately the assets of OGA, PLLC were moved out—
A: No.
Q.—correct?
MR. HUSTED: Objection, form.
MR. MORRIS: What was the witness' answer? It was "no"? Did I hear that right?

---

Thus, the pronoun "it" in the statement, "as a result of the judgment, it had no ability to continue doing business," refers to OGA, which was then operating as OGA, P.L.L.C. The Malpractice Judgment did not cause OGA, P.A. to convert to OGA, P.L.L.C.; rather, it caused OGA—the single entity formerly known as OGA, P.A., and later known as OGA, P.L.L.C.,—to cease operations entirely.

8

THE WITNESS: Yes.

McCoy also asserts that the Doctors abused the corporate form in that they voted to cease OGA's operations in 2014 and stopped working for OGA or its subsidiaries. But again, he does not explain how those actions are an abuse of the corporate form.

Because there is no evidence of any act or omission by the Doctors that would constitute an abuse of OGA's corporate form, we overrule McCoy's second issue and affirm the portion of the trial court's judgment granting Motion No. 2 in the Doctors' favor on McCoy's veil-piercing claims.

## B.     Motion No. 5: TUFTA

Under the TUFTA provision on which McCoy relies, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . , if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1). In Motion No. 5, the Doctors moved for summary judgment on the ground, *inter alia*, that there is no evidence that the individuals Doctors are "debtors."

"Debtor" is statutorily defined as "a person who is liable on a claim." *Id.* § 24.002(6). According to McCoy, the "claims" at issue "are both the TUFTA claims and the veil[-]piercing claims asserted by McCoy to recover the full amount of the [Malpractice Judgment]." But the Doctors are not liable on those claims. We have already held that the trial court properly granted summary judgment in the Doctors' favor on McCoy's veil-piercing claims, and to say that the Doctors are debtors under TUFTA because they are liable under TUFTA is simply circular.

9

Because there is no evidence that the Doctors are debtors as statutorily defined, we overrule McCoy's fifth issue and affirm the portion of the judgment granting Motion No. 5 in the Doctors' favor on McCoy's TUFTA claims.

## IV. CONCLUSION

Having overruled McCoy's second and fifth issues, we affirm the trial court's judgment without addressing McCoy's remaining issues or the Doctors' cross-point.

/s/    Frances Bourliot
Justice

Panel consists of Justices Bourliot, Zimmerer, and Wilson.